UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

CLIFFORD JOHNSON,

                Plaintiff,                            **MEMORANDUM
AND ORDER**
        -v.-                                   04-CV-2883 (DRH) (MLO)

COUNTY OF NASSAU, NASSAU COUNTY
HEALTH CARE CORPORATION, NASSAU
UNIVERSITY MEDICAL CENTER, SHARON
POPPER in her official and individual capacity,
RICHARD TURAN, in his official and
individual capacity, MICHAEL H. MOSTOW,
in his official and individual capacity, and KARL
KAMPE, in his official and individual capacity,

                Defendants.
_____

**Appearances:**

**For the Plaintiff:**
**LAW OFFICES OF FREDERICK K. BREWINGTON**
50 Clinton Street, Suite 501
Hempstead, New York 11550
By: Gregory Calliste, Jr., Esq.

**For the Defendants:**
**CLIFTON BUDD & DEMARIA, LLP**
420 Lexington Avenue, Suite 420
New York, New York 10170-0089
By:  George F. Brenlla, Esq.

**HURLEY, Senior District Judge:**

                Plaintiff Clifford Johnson ("Plaintiff") filed the present action against defendants

County of Nassau,[1] Nassau County Health Care Corporation ("NCHCC"), Nassau University

Medical Center ("NUMC"), Sharon Popper ("Popper"), Richard Turan ("Turan"), Michael H.

---

[1]  By Stipulation of Discontinuance So Ordered on April 27, 2005, the County of Nassau
was dismissed from this action.

Mostow ("Mostow"), and Karle Kampe ("Kampe") (collectively, "Defendants") claiming that he was discriminated against based on his race and in retaliation for his complaints of race discrimination. Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are undisputed unless otherwise noted.

NCHCC is a Public Benefit Corporation created by the New York State Legislature. In or about September 1999, the legislature authorized NCHCC's acquisition of certain assets and operations of Nassau County relating to the provisions of healthcare services, including NUMC. Pursuant to the New York law, County employees performing functions associated with NUMC become NCHCC employees.

## I.   *Plaintiff's Employment*

Plaintiff is an African-American male who was hired by Nassau County in 1983 as a hospital aid. In 1997, he was promoted to "Lead Painter" and also held an "informal" position leading the Office of Diversity (the "Office of Diversity" or the "Office"). When NCHCC was formed, Plaintiff became an employee of NCHCC.

According to Plaintiff, the Office of Diversity was officially opened in July 1999 and became a recognized department within the hospital. At that time, Plaintiff was promoted to Chairman and Director of the Office of Diversity. Thereafter, in June 2001, Plaintiff was also named as a Community Service Representative. In Plaintiff's role in the Office of Diversity and

as a Community Service Representative, Plaintiff acted as a liaison between the employees and NCHCC upper management regarding employee complaints of discrimination. Plaintiff and his staff, inter alia, interviewed employee complainants, conducted fact-finding inquiries, and prepared reports pertaining to matters investigated for upper management. It is undisputed that in these roles, Plaintiff brought hundreds of instances of alleged discriminatory treatment to NCHCC's attention. Plaintiff also performed community outreach activities.

## II. *Plaintiff's Claims of Discrimination/Retaliation*

Plaintiff claims that despite the fact that Defendants had created the Office of Diversity, Plaintiff and his staff were discouraged from raising issues concerning discrimination in the workplace. In this regard, Plaintiff claims that Defendants only created the Office of Diversity because they were receiving funds and grant monies from the State that were intended for fostering diversity programs at NUMC; however, Defendants never intended to permit the Office of Diversity to fulfill its purpose and did everything in their power to ensure that the Office could not function properly. For example, Plaintiff alleges that he was consistently berated and his employment threatened for reporting discriminatory complaints. Plaintiff also claims that Defendants intentionally ignored numerous valid cases of employee discrimination that he brought to their attention. Plaintiff also contends that he was retaliated against for raising claims of discrimination directed at himself and his staff personally, as well as against other employees.

On November 18, 2002, Plaintiff attended a NCHCC Board meeting wherein he raised concerns regarding discrimination against other employees at NCHCC which had not been rectified and noted that "racial discrimination was rampant." (Turan Dep. at 40.) Plaintiff

alleges that as a direct result of his public address to the Board, Defendants began retaliating against him by repeatedly transferring his office and, on one occasion, displacing his staff.

**A.   *Plaintiff's Transfer to Human Resources***

For example, it is undisputed that in or around January 2003, Defendants hired Vance Shaw, who is African-American, to work in the Office of Diversity. Around the same time, the Office of Diversity was transferred to the Human Resources Department and Plaintiff was directed to report to Shaw, who in turn reported to Kampe, the Vice President for Human Resources. Plaintiff claims that this transfer was tantamount to a demotion because once he began reporting to Shaw, who allegedly took over many of Plaintiff's duties, Plaintiff was no longer recognized as the Director of the Office of Diversity. (*See* Pl.'s Decl. ¶ 11; Decl. of Doreen Whethers ("Whethers"),[2] dated June 15, 2006 ("Whethers Decl."), ¶ 11.) Plaintiff further alleges that Defendants hired Shaw for the sole purpose of having him take over Plaintiff's responsibilities and to "subdue" the Office. (*See* Pl.'s Decl. ¶ 17; Whethers Decl. ¶ 17.) According to Plaintiff, however, Shaw defied Defendants' intentions by defending the Office's actions and assisting it in investigating complaints; Shaw was thereafter terminated. (*See* Pl.'s Decl. ¶ 17; Whethers Decl. ¶ 17.)

In January 2003, Plaintiff wrote a letter to the New York State Division of Human Rights (the "NYSDHR"), alleging that he had been retaliated against immediately following his address at the Board meeting. (*See* Pl.'s Ex. V.) In his letter, Plaintiff asserted that after his statements to the Board, he was informed that the Office of Diversity, which he oversaw, would

---

[2]   Whethers was an NUMC employee who worked under Plaintiff in the Office of Diversity.

be taken over and "run by someone with more expertise, and that [he] would no longer be in charge." (*Id.*)  He further stated that this "new person" would now decide all staff requests.  (*Id.*)  Nine days later, he was told that Kampe would take over the Office.  (*Id.*)

**B.      *Plaintiff's Other Transfers***

It is undisputed that in March or April of 2003, the Office of Diversity was transferred to the Office of the General Counsel.  Plaintiff continued to report to Shaw who now reported to Popper, Vice President of Legal Affairs and General Counsel.  It is further undisputed that in October 2003, the Office of Diversity was transferred yet again to the Academic Affairs Department, which was located next to the General Counsel's Office.  Plaintiff now reported to Mostow, the Dean of Academic Affairs; Shaw was no longer employed by NCHCC.  With regard to this latter move, Mostow directed Plaintiff to physically move his office, which was in a different building, to an office closer to Mostow.  Plaintiff's staff was moved elsewhere, to a location outside the grounds of NUMC.  Plaintiff claims this his new office was the size of a closet and filled with garbage, which took Defendants weeks to remove.  He also claims that due to the size of his office and the inadequate space given to his staff, the Diversity staff was not afforded an appropriate work area to address employees' complaints and had to meet with employees in the back of NUMC's cafeteria to address their concerns.  He further alleges that he and his staff were given clerical tasks not related to the Office of Diversity.  (*See* Pl.'s Decl. ¶ 11; Whethers Decl. ¶ 12.)

Plaintiff claims that these transfers were effectuated to deter employees from complaining of discrimination because Defendants knew that employees would not go to Human Resources or Legal Affairs to address discriminatory complaints.  Thus, Plaintiff argues,

Defendants intentionally situated the Diversity Office in "hostile areas" because they were aware

that this would intimidate employees and prevent them from lodging complaints.  Alternatively,

Defendants could keep an eye on employees that did show up to file a complaint.  Plaintiff

claims that as a result of these transfers, the Office became "inoperable and unworthy of

respect."  (Pl.'s Decl. ¶ 13.)

Finally, Plaintiff claims that he was required to submit daily reports to Mostow

every morning concerning his activities the day before.  (Pl.'s Counter-Statement Pursuant to

Local Rule 56.1 ¶30.)  Plaintiff alleges that no other employees, similarly situated to him, were

required to do so.  (*Id.*)

Defendants counter that they had legitimate nondiscriminatory reasons for all of

Plaintiff's transfers.  For example, they assert that in April 2003, since issues being investigated

in the Office of Diversity had legal ramifications, some of which were already in litigation,

NCHCC made the decision to transfer the Office of Diversity to the Office of the General

Counsel.  Thereafter, in October 2003, because the Office of Diversity was going to be

conducting more educational training, Defendants transferred it to the Dean of Academic

Affairs.

**III.**     ***Defendants' Alleged Plot to Terminate Plaintiff***

On April 14, 2004, Plaintiff hand delivered a letter to Turan, Mostow, and

Michael DeLuca ("DeLuca") asserting that he "was given an ultimatum that if [he] did not retire

[he] would be fired today."  (Pl.'s Ex. G.)  Turan, NCHCC's President and Chief Executive

Officer, directed Popper, NCHCC's General Counsel, to conduct an investigation into Plaintiff's

allegations.  After being questioned by Popper, Plaintiff identified the persons who allegedly

made the ultimatum as DeLuca, Mostow, and Turan; however, Plaintiff refused to identify the person who allegedly told him about the ultimatum. Popper also interviewed DeLuca, Mostow, and Turan, all of whom denied making any kind of ultimatum.

According to Plaintiff, he found out about the ultimatum from Nick Delasanta ("Delasanta"), Vice President of Labor Relations at the time, who was present at a meeting between Turan, Mostow, and DeLuca where they allegedly reached an agreement that Plaintiff would be fired if he did not retire early. (Pl.'s Dep. at 117-18.) Plaintiff did not disclose Delasanta's name during the course of Plaintiff's employment for fear that Delasanta would be retaliated against.[3]

Plaintiff advised Popper that he would meet with her to discuss the ultimatum and the name of the person who told him about same if she agreed to allow his attorney to be present during the meeting. On April 25, 2004, Popper sent Plaintiff a memorandum denying Plaintiff's request, noting that "[n]either you nor any other employee has the right to refuse to talk to management about hospital business, with or without an attorney." (Pl.'s Ex. H.)

According to Defendants, because Plaintiff would not provide Popper with the name of his source, and because Plaintiff was set to retire effective May 31, 2004, NCHCC required that Plaintiff take a one month paid leave of absence until his retirement. (*See* Popper Dep. at 82 ("[T]here was a concern about the need for some type of disciplinary action as a consequence of [Plaintiff] having circulated a letter containing allegations that [Plaintiff] subsequently confirmed . . . were not true.").) According to Defendants, Ann Johnson, who is

---

[3] Although Plaintiff identified Delasanta as the source at his deposition, neither side had proffered any direct statement by him.

African-American, assumed the diversity duties previously performed by Plaintiff.

According to Plaintiff, Popper told him that he should use his sick/vacation time until it was time for him to retire or he would "find things to be difficult, as far as [his] retirement was concerned – [his] benefits." (Pl.'s Dep. at 120.) As a result of Popper's "threat," Plaintiff was forced to use his sick time and retire early. In addition, Plaintiff argues that the only reason he was "set to retire" on May 31, 2004, was because he felt forced out as a result of Defendants' actions. In support of this argument, he proffers his March 24, 2004 letter to Mostow which states, in pertinent part, as follows:

> My staff and I were placed under your direction approximately six months ago. Since that time, the office functions were changed by you without any input from my staff or I and these changes served to alter the Office of Diversity Affairs mission, intent, and purpose.
>
> . . . .
>
> Let it be known, as a Department Head, I wasn't given an opportunity to express my opinion in these changes, or was I consulted of the intent prior to changes being made.
>
> It is clear that I have been isolated and ostracized with the apparent intent to demoralize, humiliate, embarrass, and degrade me and my staff in every way possible.
>
> Therefore under these conditions, that have had a severe adverse impact on me, I am now faced with retirement before my desired time.

(*See* Pl.'s Ex. R.)

## IV.    *Plaintiff's EEOC Charge*

Plaintiff filed a complaint with the NYSDHR against NUMC on March 4, 2003, alleging race discrimination and unlawful retaliation. That complaint was "cross-filed" with the

Equal Employment Opportunity Commission ("EEOC") that same day. After reviewing all of the evidence, on February 11, 2004, the NYSDHR issued a Determination and Order After Investigation dismissing the Complaint, finding "no probable cause." This finding was subsequently adopted by the EEOC without independent review and the EEOC issued Plaintiff a right to sue letter on April 12, 2004.

## V. *The Instant Action*

Plaintiff commenced this action on July 9, 2004. The Complaint asserted six causes of action: (1) unlawful race discrimination and retaliation under Title VII; (2) unlawful race discrimination and retaliation under Title VI; (3) violations of 42 U.S.C. § 1983 ("Section 1983"); (4) unlawful discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"); (5) violations of the First and Fourteenth Amendments in violation of Section 1983; and (6) unlawful race discrimination and retaliation in violation of the New York Executive Law. By Memorandum and Order dated January 23, 2006, the Court dismissed: (1) the Title VII claims against all individual defendants; (2) the Title VI claim in its entirety; (3) the Section 1983 and Section 1981 claims against NUMC; and (4) the sixth cause of action under the New York Executive Law. Defendants now move for summary judgment dismissing all remaining claims. For the reasons indicated below, the motion is granted in part and denied in part.

## DISCUSSION

## I. *Applicable Law and Legal Standards*

### A. *Summary Judgment*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other

documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful

of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Board of Elections of the City of New York*, 224 F.3d 149, 157 (2d. Cir. 2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).

**B.     *The McDonnell-Douglas Burden-Shifting Methodology***

In *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 802-804 (1973), the Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing Title VII employment discrimination claims based on indirect or circumstantial evidence. This standard was further refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S.

248, 252-253 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-511 (1993).

Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

The burden of establishing a prima facie case of employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even "minimal." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves*, 530 U.S. at 143.

Likewise, the employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp.2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri*, 759 F.2d at 995 (2d Cir. 1985)), *aff'd*, 99 Fed. Appx. 350 (2d Cir. 2004). Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. &*

*Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n.8 (7th Cir. 1987)), and  may not "sit as super personnel departments, assessing the merits — or even the rationality — of employers' non-discriminatory business decisions." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991).  Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).  A discrimination claimant may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bombero v. Warner-Lambert Co.*, 142 F. Supp.2d 196, 203 n.7 (D. Conn. 2000) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999), and citing *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)), *aff'd*, 9 Fed. Appx. 38 (2d Cir. 2001).

However, to rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151,

154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998.

## II. Plaintiff Fails to Raise a Genuine Issue of Material Fact as to his Discrimination Claims

To establish a prima facie case of discrimination under Title VII, a plaintiff must show that: (1) he belonged to a protected class, (2) was qualified for the position he held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). Defendants concede that Plaintiff has established the first two elements of his prima facie case, viz. that he was a member of a protected class and that he was qualified. Defendants contend, however, that Plaintiff cannot prove that he suffered an adverse employment action under circumstances giving rise to discrimination. Because the Court finds that Plaintiff has established the third element of his prima facie case, i.e., that he suffered an adverse employment action, but has failed to establish the final element, i.e., under circumstances giving rise to an inference of discriminatory intent, Plaintiff's Title VII discrimination claims are dismissed.

### A. Adverse Employment Actions

The Supreme Court has stated that in order to be actionable under federal discrimination laws, an adverse employment action must be "tangible" or "material." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) ("A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment.") (citation and internal quotation marks omitted). A "tangible employment action" connotes a "significant change in employment

status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* "Materially adverse" employment actions can also include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, . . . or other indices . . . unique to a particular situation." *Feingold v. N.Y.*, 366 F.3d 138, 152 (2d Cir. 2004) (citations and internal quotations omitted). However, a "bruised ego," a "demotion without change in pay, benefits, duties, or prestige," or "reassignment to [a] more inconvenient job" are all insufficient to constitute a tangible or material adverse employment action. *Burlington Indus., Inc.*, 524 U.S. at 761 (internal quotations and citations omitted).

Defendants argue that their conduct and actions against Plaintiff do not rise to the level of adverse employment actions as that term has been defined by the case law. In support of this contention, they emphasize that throughout his entire employment, Plaintiff never received any decrease in wages or benefits. They further contend that Plaintiff was merely transferred to different supervisors, his office location physically moved once, and that none of these transfers amounted to a demotion. In that regard, they argue that Plaintiff's claims "are simply a series of ordinary workplace occurrences and inconveniences" and, thus, are not actionable. (Defs.' Mem. at 10.)

The Second Circuit has stated that "'a transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career.'" *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000)). An adverse employment action may also be found where "the plaintiff was transferred from an elite unit to

one that was less prestigious or where the transfer effected a radical change in [the] nature of the plaintiff's work." *Id.* (citations and internal quotation marks omitted). To be materially adverse, however, "a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* at 207 (citations and internal quotation marks omitted).

Thus, "[i]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." *Id.* (citations and internal quotation marks omitted). "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997).

The Court finds that Plaintiff has presented evidence sufficient to create a genuine triable issue as to whether the transfers he was subjected to materially altered the terms and conditions of his employment in a negative way. Plaintiff has proffered his own declaration, as well as the declaration of Whethers, a NUMC employee who worked under Plaintiff at the Office of Diversity, which support Plaintiff's claims that as a result of the transfers, he was subjected to "a loss of status, a clouding of job responsibilities, and a diminution in authority." *Id.* at 466 (discussing *Collins v. State of Ill.*, 830 F.2d 692, 704 (7th Cir. 1987)). According to both Plaintiff and Whethers, once Plaintiff began reporting to Shaw, he was no longer recognized as the Director of the Office of Diversity and his duties and responsibilities lessened. In addition, the net result of all of the transfers and the accompanying adverse consequences --

for example, the location of his new office, being separated from his staff, having his complaints intentionally ignored by upper management, and having to meet clients in the cafeteria -- was that Plaintiff was hindered from performing his job properly. A reasonable juror could certainly infer from such evidence that the transfers resulted in a functional dismantling of Plaintiff's department, a resultant loss of prestige to Plaintiff, and/or a "setback to [his] career," *Kessler*, 461 F.3d at 206, culminating in Plaintiff being forced to retire early and use up his sick/vacation time.

In their Reply papers, Defendants argue that Plaintiff may not rely on his declaration and the declaration of Whethers to defeat summary judgment because they contradict Plaintiff's prior deposition testimony in that Plaintiff testified that: (1) for the short period of time during which he was supervised by Kampe, viz. approximately two months, his duties were the same as they had always been; (2) when he reported to Mostow, he continued to perform all of his duties as Community Service Representative as he had in the past; and (3) the Office of Diversity was never "shut down." (*See* Defs.' Reply at 3-4.)

In the Court's view, considering the record in toto, Plaintiff's testimony that he continued to perform all of his duties while reporting to Kampe and Mostow does not entirely contradict his later statements that his duties were diminished. Plaintiff also testified at his deposition that "work was being taken from [him] and given to . . . Mostow." (Pl.'s Dep. at 48.) This testimony is somewhat consistent with Plaintiff's present claim that his duties were diminished and taken over by other supervisors. Moreover, a plausible reading of Plaintiff's deposition testimony is that his job duties remained the same but he was hindered from actually performing them due to Defendant's actions. *Cf. Langman Fabrics, a div. of Blocks Fashion*

*Fabrics, Inc. v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998) ("If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete."), *amended on other grounds by*, 169 F.3d 782 (2d Cir. 1998). Most importantly, however, the Court's finding that Defendants' actions may have risen to the level of an adverse employment action does not rely solely on Plaintiff's claims that his duties were diminished. As outlined above, there were other actions taken by Defendants which, taken together, could be viewed by a rational fact-finder as negatively impacting the terms and conditions of his employment.

Finally, Plaintiff's testimony that the Office of Diversity was never "shut down" does not contradict Plaintiff's present claims that Defendants' actions made it very difficult for him to carry out his duties.

In sum, the Court finds that the transfers arguably altered the terms and conditions of Plaintiff's employment in a negative way sufficient to constitute an adverse action for purposes of his discrimination claims.

**B.**      *Inference of Discrimination*

A Title VII plaintiff may establish the last element of the prima facie case in a number of different ways depending on the specific facts of the case. *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). Here, Plaintiff argues that a juror could infer that Defendants acted with a discriminatory motive because: (1) he was treated differently than similarly situated white employees; (2) Defendants engaged in a pattern of discriminatory treatment of African-American employees; and (3) Mostow made a racist comment. The Court

will address Plaintiff's allegations in turn.

### 1.  *Similarly Situated Employees*

Plaintiff alleges that he was treated in a disparate manner in that: (1) he was subjected to excess scrutiny "compared to Caucasian employees who were similarly situated under the defendants TURAN, POPPER, MOSTOW, and who worked for NCHCC and or NUMC" (Pl.'s Mem. at 11); and (2) he and other African-American employees did not receive salary increases at the same rate as Caucasian employees.

Under Second Circuit law, where a plaintiff seeks to make out a case of discrimination "by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that []he shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir. 1997).  Furthermore, "such an employee must be similarly situated in all *material* respects--not in all respects." *McGuinness v. Lincoln Hall,* 263 F.3d 49, 54 (2d Cir. 2001 ) (emphasis in original).  In order for employees to be similarly situated in all material respects, "a plaintiff must show that h[is] co-employees were subject to the same performance evaluation and discipline standards." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (citing *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999)).  In addition, Plaintiff must demonstrate that the similarly situated employees engaged in comparable conduct. *Id.*

In order to make out a prima facie case of unequal pay for equal work under Title VII, Plaintiff must show that "[]he was paid less than non-members of h[is] class for work requiring substantially the same responsibility" and he must in addition produce evidence of "discriminatory animus." *Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999).

With respect to Plaintiff's claims of excess scrutiny, Plaintiff has failed to identify any Caucasian employee who was similarly situated to him, let alone demonstrate how they were similarly situated. Instead, Plaintiff generally contends that "Caucasian subordinates" were not subject to scrutiny. Such conclusory assertions, wholly unsupported by the record, are insufficient to create an inference of discrimination.

As to Plaintiff's claims of disparate pay, Plaintiff identifies three allegedly similarly situated employees, to wit, DeLuca, Gary Bie ("Bie") and Mostow, who he claims were given higher pay raises than he was. DeLuca was NCHCC's Chief Operating Officer, Bie was NCHCC's Chief Financial Officer, and Mostow was the Dean of Academic Affairs. Plaintiff has failed to offer competent evidence from which any reasonable trier of fact could infer that any of the three individuals to which he compares himself, all high level NCHCC corporate officers, had substantially similar job responsibilities. In addition, Plaintiff has not produced any evidence such as payroll records, to substantiate his claim that he received lower pay raises. Accordingly, the Court finds that Plaintiff's bald assertions of disparate impact are insufficient to establish a prima facie case of discrimination.

## 2. *Pattern of Discriminatory Treatment of African-American Employees*

Plaintiff alleges that Defendants engaged in a pattern of discriminatory treatment of African-American employees by ignoring and condoning complaints of racial discrimination, discouraging Plaintiff and the Office of Diversity staff from actively investigating claims of racial discrimination, and chastising Plaintiff for looking into such claims. To support these allegations, Plaintiff relies primarily on his deposition testimony, his declaration, and Whether's declaration. Plaintiff argues that a reasonable juror could infer, based upon Defendants' alleged

"pattern of systemic racial discrimination" (Pl.'s Mem. at 11), that the adverse actions taken against Plaintiff arose under circumstances giving rise to an inference of discriminatory intent. Defendants do not address this allegation by Plaintiff in the context of his attempts to establish a prima facie case of discrimination.[4]

Essentially, Plaintiff argues that it may be inferred that because Defendants quashed his efforts to raise claims of workplace discrimination in general, Defendants acted adversely against Plaintiff personally because he is African-American. The flaw in this logic, however, is that even if a juror could believe that Defendants intentionally sabotaged Plaintiff's efforts to resolve issues of employee discrimination, there is nothing in the record to indicate how many of these employee claims involved discrimination against African-Americans. For example, if Plaintiff could show that Defendants ignored a disproportionately significant number of complaints pertaining to discrimination against African-Americans, a juror could arguably infer that there was a pattern of discrimination against African-Americans. The record here, however, does not bear that out. In fact, Plaintiff's own declaration, as well as that of Whethers, assert that "[t]he function of the [Office of Diversity] was to address alleged workplace discrimination and to safeguard employees from *any form* of discrimination." (Pl.'s Decl. ¶ 5 (emphasis added); *see also* Whethers Decl. ¶ 5.) In addition, Plaintiff's January 2003 letter to the NYSDHR notes that from July 1999 to the date of the letter, the Office of Diversity had received approximately "220 claims of discrimination *of some form*." (Pl.'s Ex. V (emphasis added).) Thus, the fact that Defendants may have ignored complaints relating to any form of

_____

[4] Defendants only address these allegations as they pertain to the protected activity element of Plaintiff's prima facie case of retaliation, *see discussion infra.*

discrimination, whether based upon gender, religion, ethnicity, disability, etc., without more, is insufficient to give logical support to an inference that Defendants harbored animus towards African-Americans in particular and therefore discriminated against Plaintiff because of his race.

Further, to the extent Plaintiff attempts to establish that Defendants engaged in a "pattern of systemic racial discrimination" based upon employee complaints of discriminatory treatment (Pl.'s Mem. at 11), his claim must fail. The only evidence in the record is that employees complained to Plaintiff about unspecified forms of discrimination in the workplace. The record is devoid, however, of any evidence that such discriminatory acts actually occurred, much less that they were directed against African-Americans. Plaintiff could have submitted affidavits or deposition testimony from African-American employees who were allegedly discriminated against, but he has failed to do so. Absent such evidence, no inference may be drawn that Defendants engaged in a pattern of discrimination based on race.

In sum, the Court finds that Plaintiff's allegations regarding a general pattern of discrimination by Defendants is insufficient to raise an inference of discrimination against Plaintiff because he is African-American.

### 3.        *Turan's Alleged Racist Comment*

The only remaining evidence Plaintiff proffers in support of his claim that he suffered adverse employment actions under circumstances giving rise to an inference of discriminatory intent is his claim that Turan, NCHCC's President and Chief Executive Officer, made a racist comment to him. In support of this allegation, Plaintiff relies on the following excerpt from his deposition testimony:

| Q. | What derogatory remarks did you hear Mr. Turan make? |
| A. | I once came to him with a proposal about dealing with the black community and his response was "I don't want this to become a black hospital." |
| Q. | And when did you bring that proposal to him? |
| A. | [I]t might have been 2002. |
| Q. | Any other comments? |
| A. | No, not that I can recall. |

(Pl.'s Dep. at 17-18.)  Defendants do not address Turan's alleged comment.

The Second Circuit has repeatedly held that "stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination." *Abdu-Brisson*, 239 F.3d at 468.  "If it were otherwise, disparaged workers who had the 'fortuity' of being in the class encompassed by the stray remark would have an instantaneous jury case on discrimination, regardless of the ground for their dismissal.'" *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir. 1998).  The remarks, however, will no longer be deemed stray "when other indicia of discrimination are properly presented [so that] the jury has a right to conclude that they bear a more ominous significance." *Id.*   In order for the remarks to be deemed significant, the plaintiff must show their nexus to the adverse employment decision.  *Cf. id.*; *see also Revere v. Bloomingdale's Inc.*, No. 03 CV 5043, 2006 WL 3314633, at *7. (E.D.N.Y. Nov. 14, 2006).

Neither party addresses the significance, or non-significance, of Turan's remark in juxtaposition with the relevant case law.  In the Court's view, Turan's comment, standing alone, is insufficient to raise an inference of discrimination because there is no nexus between his remark and any of the alleged adverse acts.  *See Tomassi v. Insignia Fin. Group, Inc.*, --- F.3d ----, No. 05-6219-CV, 2007 WL 495314, at *4 (2d Cir. Feb. 16, 2007) ("[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.").  Plaintiff fails to explain how Turan's

alleged desire to prevent the hospital's patient base from becoming "black" can logically be tied to any of the alleged adverse actions and no connection is apparent from the Court's review of the record. Simply put, a juror could not infer that Plaintiff was transferred based on his race from Turan's remark alone. Moreover, Turan's alleged comments were made two years before Plaintiff was allegedly forced to retire. *See Richardson v. N.Y.S. Dep't of Correctional Serv.*, 180 F.3d 426, 447 (2d Cir. 1999) (noting that two years is too long a time to support an inference of a causal connection), *abrogated on different grounds, Burlington Northern and Santa Fe Ry. Co. v. White*, --- U.S. ----, 126 S. Ct. 2405 (2006); *see also Tomassi*, 2007 WL 495314, at *4 ("[T]he closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."). Accordingly, on this record, the Court finds that Turan's comments are indeed stray and insufficient to show that the circumstances surrounding his transfers give rise to an inference of race discrimination. Plaintiff's claims of discrimination pursuant to Title VII are therefore dismissed.

### III.    *There are Genuine Issue of Material Fact as to Plaintiff's Retaliation Claims*

Defendants argue that Plaintiff's retaliation claims should be dismissed because Plaintiff cannot establish a prima facie case of retaliation. Title VII "forbids an employer to retaliate against an employee for, inter alia, complaining of employment discrimination prohibited by Title VII." *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-3(a)). Claims of retaliation pursuant to Title VII are analyzed according to the burden-shifting framework set forth in *McDonnell Douglas*. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).

"In order to present a prima facie case of retaliation under Title VII . . . , a

plaintiff must adduce 'evidence sufficient to permit a rational trier of fact to find [1] that [ ] he engaged in protected participation or opposition under Title VII . . ., [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.'" *Kessler*, 461 F.3d at 205-206 (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)). Once the employee has established a prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse action. If it does so, then the burden shifts back to the employee to demonstrate pretext. *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 94-95 (2d Cir. 2001).

Here, Defendants contend that Plaintiff cannot satisfy any element of a prima facie case of retaliation. Because the Court disagrees with Defendants and finds that a reasonable view of the record does support each element of Plaintiff's prima facie case, Defendants' motion for summary judgment on this ground is denied.

A. **Protected Activity**

In order for Plaintiff to have been involved in a protected activity, Plaintiff must have had "a good faith, reasonable belief that the underlying employment practice was unlawful" under Title VII. *Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). Defendants argue that because raising issues of alleged workplace discrimination was part of Plaintiff's job, Plaintiff's assertions, as a matter of law, cannot constitute protected activity. Specifically, Defendants refer to the November 2002 Board meeting where Plaintiff complained that "racism was rampant." Because raising these concerns was one of Plaintiff's duties, Defendants contend that they may not form the basis for a Title VII retaliation suit.

In support of their argument, Defendants rely on *Garcetti v. Ceballos*, -- U.S. --, 126 S. Ct. 1951 (2006), where the Supreme Court held in the context of a First Amendment retaliation claim: **"**[W]hen public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 261 (emphasis added). Defendants also cite cases holding that in order to engage in a statutorily protected activity under the Fair Labor Standards Act, the employee must "step outside of his or her role of representing the company and file an action adverse to the employer." *See, e.g.*, *Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 102 (1st Cir. 2004) (citation and internal quotation marks omitted).

Defendants further cite two cases under Title VII. In *EEOC v. HBE Corp.*, 135 F.3d 543, 554 (8th Cir. 1998), the Eighth Circuit found that the employee had produced sufficient evidence to establish that he engaged in a protected activity where he "refused to implement a discriminatory company policy [thereby] plac[ing] him outside the normal managerial role which is to further company policy." Similarly, in *Vidal v. Ramallo Bros. Printing, Inc.*, 380 F. Supp. 2d 60, 62 (D. P.R. 2005), the court noted that protected activity under Title VII "is limited to activity that is adverse to the company, or outside the employee's normal employment role; this would include the filing of a complaint, but not reporting suspected discrimination to a supervisor."

Plaintiff claims that his actions are distinguishable from the above-cited cases because he went beyond reporting *employee* complaints of discrimination; he also voiced opposition against Defendants' acts of racial discrimination against him *personally*. In support

of this claim, Plaintiff points to "several occasions from 2003 through 2004" (Pl.'s Mem. at 15), where Plaintiff allegedly complained that he was being discriminated against because he was African-American. In the Court's view, most, if not all, of the instances upon which Plaintiff relies do not advert to discrimination against him personally because of his race. Rather, they complain in one fashion or another of Defendants' discrimination against employees in general. The Court need not reach this issue, however, because it finds that there is ample other evidence which, though not related to discrimination against Plaintiff personally, could support the conclusion that Plaintiff's actions went beyond his official duties.

   For example, there is evidence to suggest that Defendants believed that Plaintiff's presentation at the November 2002 Board meeting was inappropriate and outside his role as Director of the Office of Diversity. Mostow, Defendants' Dean of Academic Affairs, testified at his deposition that at the Board meeting, Plaintiff "made certain allegations about African-American employees not being given adequate opportunities for advancement, and indicated that he felt that that was a direct result of racist activities in the management of the Medical Center." (Mostow Dep. at 23.) Mostow noted that Plaintiff did not "speak formally"; rather "[h]e spoke at the portion of the meeting which was open to the general public to make any kind of comments they liked. He did not make a presentation about his work activities." (Mostow Dep. at 22-23.) Mostow felt that Plaintiff "should have made those feelings known to the persons that he reported to prior to making them at a public meeting." (*Id.* at 25.) Similarly, with regard to the Board meeting, Turan testified that "if [Plaintiff] had credible allegations it would [have] be[en] better to [have] investigated without exposing it publicly . . . ." (Turan Dep. at 94.)

   In addition, there is also evidence that Plaintiff not only raised employee

complaints of discrimination but that he complained that Defendants were not fulfilling their duties under Title VII in properly investigating these complaints. Such actions could clearly be viewed as being "adverse" to Defendants and outside of Plaintiff's normal role. *See HBE Corp.*, 135 F.3d at 554.

Accordingly, the Court finds that the record supports a finding that Plaintiff engaged in a protected activity under Title VII.

### B. *Adverse Action*

The Court has already found, *see* discussion *supra*, that Plaintiff suffered adverse employment actions insofar as his discrimination claims were concerned. Subsequent to the parties' briefing on this motion, the Supreme Court altered the standard previously used by the Second Circuit in defining an adverse employment action in retaliation claims. Under that earlier standard, as noted above, examples of adverse employment actions included only those which were deemed "materially adverse" alterations to the terms of employment, such as termination, demotion via a reduced wage, salary or job title, or a material loss of benefits. *See Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006). In *Burlington Northern*, however, the Supreme Court held that "the anti-retaliation provision" of Title VII "is not limited to discriminatory actions that affect the terms and conditions of employment." 126 S. Ct. at 2412-13. Instead, the Court held that "actionable retaliation" was that which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (citations and internal quotation marks omitted); *id.* (noting that anti-retaliation provision prohibits "employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers") (citation and internal quotation marks omitted).

Here, having already determined that Plaintiff suffered adverse employment actions in the context of his discrimination claims, the Court easily finds that Plaintiff satisfies this element of his retaliation claims. A factfinder might well conclude that the transfers and alleged concomitant adverse consequences -- if proven true -- would be sufficient to dissuade a reasonable worker from voicing alleged Title VII violations committed by Defendants. Accordingly, the Court finds that Plaintiff has established this element of his prima facie case.

**C.** *Causal Connection*

The final element of Plaintiff's prima facie case of retaliation is that a causal connection exists between the protected activity and the adverse action.[5] Defendants' arguments on this element, raised for the first time in their reply memorandum, pertain to Plaintiff's January 2003 letter to the NYSDHR. Essentially, Defendants argue that Plaintiff cannot establish that any of the alleged adverse actions were the result of his January 2003 letter because most of these acts occurred *before* the letter was sent. The Court's findings concerning protected activity, however, are not reliant on this letter; rather, the Court has already found that Plaintiff's actions at the November 2002 Board meeting constitute protected activity for purposes of establishing a prima facie case of retaliation. Because the adverse actions allegedly began to occur within weeks of this meeting, the Court finds that a rational factfinder could infer a causal connection between the alleged adverse actions suffered by Plaintiff and the protected activity. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that temporal

---

[5] Although Defendants make the general claim that Plaintiff cannot meet any element of his prima facie case, they do not specifically dispute the notice element, viz. that they were aware that Plaintiff engaged in a protected activity. Accordingly, the Court will not address this element.

proximity alone may suffice to establish causation where proximity "very close"); *Kessler*, 461

F.3d 210 (finding causation where alleged "retaliatory animus followed closely on the heels of

his protected activity").

### D.       *Defendants' Legitimate, Non-Discriminatory Reasons for the Adverse Actions*

Once the employee has established a prima facie case, the employer must proffer

a legitimate, non-discriminatory reason for the adverse action.  As noted previously, an

employer's burden of showing a legitimate non-discriminatory reason for its actions is not

particularly onerous.

Here, with regard to Plaintiff's transfers, Defendants allege that: (1) in late 2002,

Kampe was hired to become the new Vice-President of Human Resources and Turan "made a

decision" to have the Office of Diversity report to Kampe; (2) the Office was thereafter

transferred to the Office of the General Counsel because the issues being investigated by the

Office involved legal matters; (3) the Office was later transferred to the Dean of Academic

Affairs because the Office was performing more educational training; and (4) Plaintiff's office

was physically moved closer to Mostow so that Plaintiff would be in close proximity with

Mostow, as were all employees who reported directly to Mostow.  (*See* Defs.' Mem. at 14; *see*

*also* Defs.' Local Rule 56.1 Stmt. ¶¶ 17, 23, 27, 29 (citing relevant portions of deposition

testimony).)  With respect to physically separating Plaintiff from his staff, Mostow testified that

he wanted Plaintiff's office to be near his so they could meet whenever they needed to.  (*See*

Mostow Dep. at 63.)  He moved Plaintiff's support staff to another building which had been

newly renovated because he "felt it [was[ important that all of the staff that reported to me in

training activities should be located in one building. . . . [I]f the opportunity arose that they had

down time, they could share in the activities of the other members and vice versa, if needed."
(*Id.* at 63-64.)

Based on the above, the Court finds that Defendants have articulated legitimate, non-discriminatory reasons for Plaintiff's transfers. Although the Court is underwhelmed by counsel's proffered reason for Turan's decision to transfer the Office of Diversity to Human Resources, i.e., Turan "made a decision", a review of Turan's deposition testimony reveals that in making this transfer, Turan was hoping to "enhance" the Office's role. (Turan Dep. at 66.) More specifically, Turan testified that because employee complaints were typically directed to Human Resources, he believed that having the Office of Diversity report to Human Resources would assist the Office in being "more effective." (*Id.*) Given the proffered reasons for the transfers, viz., in the exercise of Defendants' judgment, they believed the transfers to be both efficient and more beneficial for all involved, the Court finds that Defendants have satisfied their burden. *See Dister*, 859 F.2d at 1116 ("A business decision need not be good or even wise. It simply has to be nondiscriminatory . . . .") (citation and internal quotations marks omitted).

E.      *Pretext*

Once an employer has articulated a legitimate, non-discriminatory reason for its actions, the plaintiff then has the burden of showing that the stated reason was pretextual, and that the employer was motivated at least in part by unlawful retaliation.

In an attempt to demonstrate that Defendants' proffered reasons are merely a pretext for unlawful retaliation, Plaintiff points to the following evidence: (1) Popper testified that after the Board meeting, Turan expressed "unhappiness" that Plaintiff made those statements at the Board meeting instead of addressing them "through management channels" and that Turan

believed Plaintiff's comments were "inappropriate" (*see* Popper Dep. at 18); Turan testified, however, that although he would have preferred had Plaintiff spoke to him first prior to engaging the Board, he "didn't have a problem with [Plaintiff] doing it the way he did it." (Turan Dep. at 94.) Either way, Turan did not speak to Plaintiff regarding his comments after the Board meeting. (*See* Turan Dep. at 45-46); (2) Mostow testified that Plaintiff should not have addressed the Board in the manner in which he did without first relaying such concerns to the persons that he reported to (Mostow Dep. at 25); (3) Mostow testified that the number of investigations performed by the Office of Diversity was so "insignificant" that it was "incredulous" that Plaintiff considered his job a "work activity"; yet Mostow felt it was necessary to move Plaintiff's office next to his and in the process, separate Plaintiff from his staff, so that he was easily accessible to Plaintiff should Plaintiff need him. (Mostow Dep. at 63, 78-79.) Moreover, Defendants concede that Plaintiff had brought over 300 instances of unfair treatment to Defendants' attention. (Defs.' Local Rule 56.1 Stmt. ¶ 14); and (4) despite Mostow's claim that the Office of Diversity actually investigated just a small number of complaints, Mostow later testified that he was unaware as to how many complaints of discrimination against Defendants were filed with the EEOC or the NYSDHR and that he never requested or was aware of such information. (Mostow Dep. at 80-81.) This is so despite the fact that one of the Office's primary functions was to attempt to resolve employee complaints in-house so that they did not reach the agency level.

Construing the evidence in the light most favorable to Plaintiff, the Court finds that there is a sufficient basis for a trier of fact to doubt Defendants' proffered evidence and ultimately find that the reasons offered by Defendants were pretextual.

Given the strong temporal correlation between Plaintiff's complaints at the Board meeting and the alleged adverse actions, the evidence that Defendants were upset over Plaintiff's comments at the Board meeting, and Mostow's proffered reasons for transferring Plaintiff and his staff juxtaposed against his testimony regarding how insignificant Plaintiff's job was and his lack of knowledge about the number of cases Plaintiff's Office had handled, the Court finds that a reasonable juror could conclude that Defendants retaliated against Plaintiff based on his complaints pertaining to Defendants' alleged discrimination. *Cf. Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998) (holding that a strong temporal connection between the plaintiff' complaint along with other circumstantial evidence is sufficient to raise an issue with respect to pretext), *abrogated in part on other grounds*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Accordingly, Defendants' motion for summary judgment on Plaintiff's Title VII retaliation claims is denied.

## IV. *Defendants' Motion to Dismiss Plaintiff's Claims Under Sections 1981 and 1983*

### A. *Plaintiff's Section 1981 and 1983 Claims are Dismissed With Respect to his Claims of Race Discrimination; Plaintiff's Section 1983/Fourteenth Amendment Claims are Dismissed*

Because the Court has already dismissed Plaintiff's Title VII claims to the extent they are based on race discrimination, his claims under Sections 1981 and 1983 which are based on this theory of recovery must fail as well. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 n. 1 (1993) ("*McDonnell Douglas* framework is fully applicable to racial-discrimination-in-employment claims under 42 U.S.C. § 1983 "); *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in

employment in violation of § 1981 . . . and the factors justifying summary judgment dismissing Patterson's Title VII claim against the municipal defendants for termination of his employment equally support the summary dismissal of his claims for termination brought under 42 U.S.C. §§ 1981 and 1983.") (citations omitted)

In addition, to the extent Plaintiff's Section 1983 claim is predicated on a violation of the Due Process Clause of the Fourteenth Amendment, his claim is dismissed as there is no evidence that he was deprived of a property[6] or liberty interest.[7] *See Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998) ("To state a Section 1983 claim [premised upon a due process violation], a plaintiff must demonstrate that he possessed a protected liberty or property interest, and that he was deprived of that interest without due process.). However, Plaintiff's Section 1981 and 1983 claims do survive to the extent they are based on Plaintiff's claims of retaliation, assuming that they are not barred by res judicata and/or collateral estoppel, which is discussed below.

**B.**     ***Whether Plaintiff's Section 1981 and 1983 Claims
are Barred by Res Judicata and/or Collateral Estoppel***

On March 4, 2003, Plaintiff filed a complaint with the NYSDHR against NUMC alleging race discrimination and unlawful retaliation. After an investigation, on February 11,

---

[6] In order to demonstrate an interest protectable under the Constitution, a person must have a "'legitimate claim of entitlement to it.'" *Abramson v. Pataki*, 278 F.3d 93, 99 (2d Cir. 2002) (quoting *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Here, there is no evidence that Plaintiff was anything other than an at-will employee. *See Segal v. City of N.Y.*, 459 F.3d 207, 216 (2d Cir. 2006).

[7] There is no evidence which would support a "stigma-plus" claim sufficient to demonstrate a deprivation of a liberty interest. *See Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004)

2004, the NYSDHR issued a Determination and Order After Investigation dismissing the

Complaint, finding "no probable cause." Plaintiff was represented by present counsel during the

entirety of the proceeding. (*See* Reply Aff. Ex. 1.) Plaintiff did not seek review of this

determination in state court.

By Memorandum and Order dated January 23, 2006, this Court held that, based

on the NYSDHR's finding of no probable cause, Plaintiff's claims under Sections 1981 and 1983

were barred on the basis of res judicata and/or collateral estoppel against defendant NUMC only.

Because neither party had addressed the fact that Plaintiff's NYSDHR complaint was asserted

against defendant NUMC only, while Plaintiff's Section 1981 and 1983 claims were asserted

against all defendants, the Court's holding was limited to NUMC.

Essentially, the Court found that the NYSDHR proceeding afforded Plaintiff a

full and fair opportunity to litigate his claims.[8] In doing so, the Court rejected Plaintiff's

argument that preclusion should not apply because the NYSDHR made its determination based

solely upon documentation provided by both parties and did not conduct a hearing:

> [T]he Court finds that Plaintiff has not met his burden of
> establishing that he did not have a full and fair opportunity to
> litigate the issue of NUMC's alleged discrimination and retaliation
> before the NYSDHR. Although Plaintiff was not afforded a
> hearing before the NYSDHR, he has not explained how a hearing
> would have altered the outcome, or what facts could have been
> brought out that may have changed the result. Additionally,
> although the NYSDHR investigation may not have afforded
> Plaintiff the full panoply of procedures that are available to
> litigants in a civil action, the New York Court of Appeals has made
> clear that this fact alone is insufficient to make collateral estoppel
> inapplicable. *See Jeffreys v. Griffin*, 1 N.Y.3d 34, 42 (2003)

---

[8] Plaintiff did not dispute that there was identity of issue between the NYSDRH
proceeding and the present action.

> (finding that disciplinary hearings were "'quasi-judicial' in the general sense required for application of the doctrine of collateral estoppel. . . . notwithstanding the differences between these proceedings and a civil trial.").

(Jan. 23, 2006 Mem. and Order at 19.)

Defendants now argue that Plaintiff's Section 1981 and 1983 claims should be barred against all defendants because they are in privity with NUMC. Defendants base this contention on the facts that: (1) NUMC is not a legal entity; rather it is a medical center owned, operated and controlled by NCHCC; and (2) the individual defendants are officers of NCHCC.

"In its modern form, the principle of privity bars relitigation of the same cause of action against a new defendant known by a plaintiff at the time of the first suit where the new defendant has a sufficiently close relationship to the original defendant to justify preclusion." *Central Hudson Gas & Elec. Co. v. Empresa Naviera, Santa S.A.*, 56 F.3d 359, 367-68 (2d Cir. 1995). Government officials sued in their official capacities are generally considered to be in privity with the government entity that they serve. *See Waldman v. Village of Kiryas Joel*, 39 F. Supp. 2d 370, 382 (S.D.N.Y. 1999), *aff'd*, 207 F.3d 105 (2d Cir. 2000); *Peros v. Castano*, No. CV-01-4457, 2002 WL 603042, at *2 (E.D.N.Y. Mar. 22, 2002); *see also Amadasu v. Bronx Lebanon Hosp. Ctr.*, No. 03 Civ. 6450, 2005 WL 121746, at *8 (S.D.N.Y. Jan. 21, 2005) (finding hospital employees and affiliate in privity with hospital for res judicata purposes), *Report and Recommendation Adopted by*, No. 03 CIV. 6450LAK, 2005 WL 954916 (S.D.N.Y. Apr. 26, 2005). A government official sued in his or her personal capacity, however, is not considered in privity with the government. *See Peros*, 2002 WL 603042, at *3; *see also* 13 C. Wright & A. Miller, Federal Practice and Procedure § 4458 (2007) ("The relationships between a government and its officials justify preclusion only as to litigation undertaken in an official

capacity. Thus a judgment against a government does not bind its officials in subsequent litigation that asserts a personal liability against the officials.").

Here, NCHCC has a sufficiently close relationship with NUMC to be considered in privity with it. *See, e.g.*, *Alpert's Newspaper Delivery, Inc. v. New York Times Co.*, 876 F.2d 266, 270 (2d Cir. 1989) (privity may be found where a party not named in previous litigation nonetheless controlled and financed the defense of the suit). In addition, Popper, Turan, Mostow, and Kampe -- in their official capacities -- are also in privity with NUMC for res judicata purposes. Thus, given this Court's prior holding that Plaintiff's Section 1981 and 1983 claims are barred against NUMC, and the Court's present finding that NCHCC and Popper, Turan, Mostow, and Kampe in their official capacities are in privity with NUMC, it would appear that Plaintiff's Section 1981 and 1983 claims should be barred against these additional defendants as well. This does not end the Court's analysis, however, as Plaintiff has presented multiple arguments as to why res judicata should not apply to these other defendants.

First, Plaintiff argues that res judicata and/or collateral estoppel cannot be used to *shield* the additional defendants from liability; rather, it may only be used as a *sword*, or offensively. This argument has no merit as courts have long acknowledged the use of defensive collateral estoppel by a defendant who was not a party to the previous litigation.[9] *See Parklane Hosiery Co. v. Shore*, 439 U.S 322, 326-31 (1979) (the doctrine of mutuality, which provided that only parties to prior judgment could be bound by it, no longer applies to the defensive use of

_____

[9] "[O]ffensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party. Defensive use occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant." *Parklane*, 439 U.S. at 326 n.4.

collateral estoppel).

Plaintiff's next argument is not so easily disposed of. Essentially, Plaintiff asserts that res judicata should not bar his Section 1981 and 1983 claims against the newly named defendants because: (1) his federal suit involves additional incidents of retaliation which post-date his hearing at the NYSDHR; and (2) he has adduced new facts through discovery, which were not available in the state proceeding, to support his claims.[10]

Plaintiff's first contention, concerning additional incidents of retaliation, pertains to the "identity of claims" element of collateral estoppel. *See Monahan v. N.Y.C. Dep't of Corrections*, 214 F.3d 275, 289 (2d Cir. 2000). Plaintiff's second contention, concerning newly obtained facts, goes to the "full and fair opportunity" element. *See Locurto v. Giuliani*, 447 F.3d 159, 171 (2d Cir. 2006). These are distinct inquiries from the privity element, which is at issue herein, which only looks to whether the newly added defendants were sufficiently close to NUMC so as to justify preclusion. In fact, this Court has already ruled on these two elements in its January 23, 2006 Memorandum and Order regarding Defendants' motion to dismiss Plaintiff's Section 1981 and 1983 claims. In that Order, the Court noted that Plaintiff did not dispute that there was identity of issue between the NYSDRH proceeding and the present action (Jan. 23, 2006 Mem. and Order at 11), as Plaintiff made no mention of any additional incidents of retaliation. In addition, the Court found that Plaintiff did have a full and fair opportunity to litigate his claims before the NYSDHR, noting that Plaintiff had "not explained how a hearing would have altered the outcome [of the NYSDHR proceeding], or what facts could have been

---

[10] Insofar as Plaintiff's arguments pertain to his discrimination claims, which have already been dismissed, the Court will not address them.

brought out that may have changed the result." (*Id.* at 19.) Because "Plaintiff failed to make these arguments initially when this Court dismissed all Section 1981 and 1983 claims against NUMC" (Defs.' Reply at 9), Defendants argue that Plaintiff is now precluded from raising them at this juncture, when the sole issue before the Court is whether the additional defendants are in privity with NUMC, the only defendant named in the NYSDHR proceeding.

Presumably, Defendants are attempting to invoke the law of the case doctrine. This "doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 7 (2d Cir. 1996) (citations and internal quotation marks omitted). However, "[t]he doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Id.* (citation and internal quotation marks omitted). A district court may reconsider its own decision if the law has since changed, new evidence becomes available, to correct an error, or if a "manifest injustice would otherwise ensue." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 44 (2d Cir. 2005).

Here, the NYSDHR dismissed Plaintiff's claims, in part, because it found no evidence which demonstrated that Plaintiff's alleged opposition to discriminatory practices was a factor in the reorganization of the Office of Diversity or his alleged demotion. (Jan. 23, 2006 Mem. and Order at 13.) Through discovery, however, Plaintiff has since elicited deposition testimony from several of the individual defendants reflecting their displeasure over Plaintiff's public remarks at the Board meeting. It is undisputed that Plaintiff was not afforded a hearing at the NYSDHR, nor was he able to engage in discovery. Had the NYSDHR had the deposition

testimony outlined above, it may have reached a different conclusion. At the very least, such testimony is clearly relevant to Plaintiff's claims. *See Locurto v. Giuliani*, 447 F.3d 159, 171 (2d Cir. 2006) (refusing to give preclusive effect to agency finding where plaintiffs "were denied adequate discovery into the defendants' motivation for firing them"; "Where, as here, a Government employee claims to have been fired for an unconstitutional reason, discovery into the reason he was fired is, to say the least, relevant.").

Moreover, with regard to Plaintiff's claim of additional incidents of retaliation which post-date the NYSDHR proceeding, to the extent these incidents did not arise out of "the same transaction or connected series of transactions" raised before the NYSDHR, *Monahan*, 214 F.3d at 289 (citations and internal quotation marks omitted) (emphasis omitted), i.e., Plaintiff's comments at the Board meeting, they would not be barred by res judicata. For example, Plaintiff's claims of retaliation stemming from the filing of the NYSDHR complaint itself would not be precluded.

Although the Court recognizes that Plaintiffs should have raised these issues in the first instance, viz. in response to Defendants' motion to dismiss, Defendants have not indicated how they are prejudiced by the surfacing of this belated information. That factor, together with this Court's new knowledge that Plaintiff may not have been afforded a full and fair opportunity to litigate his claims at the NYSDHR, constrain the Court to find that Plaintiff's claims against NCHCC and the individual defendants are not barred by res judicata and/or collateral estoppel. Were the result otherwise, given Plaintiff's inability to conduct discovery at the NYSDHR hearing, a "manifest injustice would otherwise ensue." *Stichting Ter Behartiging*, 407 F.3d at 44. Accordingly, Defendants' motion for summary judgment on Plaintiff's Section

1981 and 1983 claims against NCHCC, Popper, Turan, Mostow, and Kampe is denied.[11]

### V.       *Plaintiff's Punitive Damages Claim is Dismissed*

Defendants' final argument is that Plaintiff's request for punitive damages should be dismissed, because NCHCC, as a public benefit corporation, and its agents, are immune from punitive damages.  (*See* Defs.' Mem. at 18-19.)  Plaintiff has failed to respond to this argument, and it appears that Defendants are correct insofar as NCHCC is concerned.  *See Everson v. N.Y.C. Transit Auth.*, 216 F. Supp. 2d 71, 81 (E.D.N.Y. 2002) and cases cited therein (public benefit corporation exempt from punitive damages); *see also Munafo v. Metropolitan Transp. Auth.*, No. 98 CV-4572, 00-CV-0134, 2003 WL 21799913, at *22 (E.D.N.Y. Jan. 22, 2003).  Accordingly, Plaintiff's claim for punitive damages is therefore dismissed as against NCHCC and NUMC.[12]

In a Section 1983 action against individual defendants, however, punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Thus, to the extent the individual defendants are sued in their individual capacities, the Court declines to dismiss Plaintiff's punitive damages claim.  *See New Winsdor Volunteer Ambulance Corps., Inc. v. Meyers*, 442 F.3d 101, 122 (2d Cir. 2006) ("Although a municipality itself is immune from a claim for punitive damages, that immunity does not extend to a municipal official sued in his individual

_____

[11]  Because Plaintiff has not asked the Court to revisit its holding with respect to NUMC, the Court does not address Plaintiff's claims in this regard.

[12]  Municipalities are not liable for punitive damages.  *See Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

capacity.") (citations omitted).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED in part and GRANTED in part. Defendants' motion is GRANTED to the extent that: (1) Plaintiff's Title VII claims and his claims pursuant to Sections 1981 and 1983 which are based on race discrimination are dismissed; (2) Plaintiff's Section 1983 claim for a violation of the Due Process Clause of the Fourteenth Amendment is dismissed; and (3) Plaintiff's claim for punitive damages is dismissed as against NCHCC, NUMC, and Popper, Turan, Mostow, and Kampe in their official capacities. Defendants' motion is DENIED to the extent Defendants sought dismissal of: (1) Plaintiff's Title VII retaliation claims; and (2) Plaintiff's Section 1981 and 1983 claims against NCHCC, Popper, Turan, Mostow, and Kampe based on res judicata and/or collateral estoppel.

**SO ORDERED.**

Dated: Central Islip, N.Y.
        March 15, 2007

                        /s
                        Denis R. Hurley,
                        United States District Judge